FILED
00 JAN 14 PM 2: 35
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA., ]<br>]<br>Plaintiff, ]<br>]<br>vs. ]<br>]<br>ALLIED BATTERY COMPANY, INC., ]<br>et al., ]<br>]<br>Defendants. ]<br>] | CV 98-N-0446-S<br><br>ENTERED<br>JAN 1 4 2000 |
| UNITED STATES OF AMERICA, ]<br>]<br>Plaintiffs, ]<br>]<br>vs. ]<br>]<br>CSX TRANSPORTATION, INC., et ]<br>al., ]<br>]<br>Defendants. ]<br>] | CV 98-N-2561-S |

**Memorandum Opinion**

**I.     Introduction.**

Plaintiff United States of America brings this action pursuant to the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 *et seq.* ("CERCLA"), seeking to recover in excess of $1.2 million in costs related to the removal action taken to prevent the release of lead and other hazardous substances from a site known as the Carlie Lee site in Tarrant City, Alabama. The case is presently before the

40

court on a motion for summary judgment (Doc. No. 26) filed by defendants CSX Transportation, Inc., Lucent Technologies, Inc., and Thompson Tractor, Inc.[1] The defendants argue that the government's action is time-barred by virtue of 42 U.S.C. § 9613(g)(2)(A) because the government failed to file its cost recovery action within three years of the completion of the removal action. The motion has been briefed by the parties and is ripe for decision. Upon due consideration, the motion for summary judgment will be denied.[2,3]

## II. Statement of Facts.[4]

From 1969 to 1980, Carlie M. Lee, Sr., owned and operated a battery breaking business on the site at issue. The operation involved buying lead batteries, breaking them open, removing the lead, and selling the lead to secondary lead smelting companies, which resulted in lead being released into the soil at the site. The type of cleanup conducted by the EPA to remove the lead at the site was known as a "time critical removal action" under

---

[1] USX Corporation had joined in the defendants' motion for summary judgment. However, a motion (Doc. No. 32) for entry of order of dismissals and joint stipulation of dismissals (Doc. No. 33) were executed by the United States and defendants Navistar International Transportation Corporation and USX Corporation on September 23, 1999. An order (Doc. No. 39) of dismissal was entered by the court on October 18, 1999. Accordingly, USX's motion for summary judgment is no longer before the court, and the motion (Doc. No. 34) for summary judgment filed by defendant Navistar is likewise moot.

[2] The court also has for consideration the defendants' motion (Doc. No. 30) to strike declaration of Leo Francendese and the government's response (Doc. No. 31). The court has considered the motion contemporaneously with the motion for summary judgment, and has disregarded any portions of the declaration which are not properly before the court on summary judgment.

[3] Although the defendants have requested oral argument on their motion for summary judgment and their motion to strike, the court finds that these motions are based purely on questions of law and can be resolved without a hearing. Accordingly, the defendants' request is denied.

[4] The facts set out below are gleaned from the parties' submission of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the evidentiary record. These are the "facts" for summary judgment purposes only. They may not be the actual facts. *See Cox v. Administrator U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

the EPA regulatory National Contingency Plan (NCP). Don Rigger and Leo Francendese were on-scene coordinators (OSCs) for the site, although Mr. Francendese was initially in training under the guidance of Mr. Rigger at the site. The OSC's role, in part, is to gather information and make decisions regarding the cleanup of the site. EPA contracted with Westinghouse Environmental Services to perform the on-site cleanup activities, while Roy F. Weston, Inc., was contracted to act as the Technical Assistance Team (TAT) to coordinate and oversee the work.

An Action Memorandum approved on September 23, 1993, authorized and provided funding for the removal action. By a Scope of Work incorporated in the Technical Directive Document (TDD), dated October 15, 1993, EPA directed the TAT contractor to document on-site activities, monitor the performance of the removal, collect and analyze samples, and submit a draft final OSC Report to EPA. A Site Sampling Plan approved by EPA on October 18, 1993, before on-site removal activities began states:

> The ROY F. WESTON Project Officer . . . will maintain contact with the EPA On-Scene Coordinator, Leo Francendese, to coordinate activities throughout the project. Activities under this project will be reported in status, POLREP's, the final report, and deliverables as designated by the OSC. The final report will be submitted to EPA by the Technical Assistance Team within the required time frame.

Plaintiff's response (Doc. No. 28) exhibit 4. The removal action was commenced in November of 1993, which is the commencement date for purposes of the 12-month completion requirement under the NCP. Mr. Rigger, as an OSC, was responsible for ensuring that the removal action would be completed within 12 months. A Second Action

3

Memorandum was approved by EPA on February 15, 1994, which increased funding for the removal action. That memorandum states:

> Because the soil and debris at the Site are considered hazardous waste by the toxicity characteristic for lead, it must be treated before it can be land disposed. It was with this in mind that the choice of fixation was made. Fixation is a proven technology for this soil and debris waste stream. Extensive treatability studies and field verification will document the nonleachability of this waste. In addition to subjecting the treated waste to the Toxicity Characteristic Leaching Procedure, the treated waste will also undergo Multiple Extraction Procedures that will further guarantee its nonleachability . . . .

Defendants' motion (Doc. No. 26) exhibit C.

A final pollution report was issued by Mr. Rigger and Mr. Francendese on April 18, 1994. That report stated that future actions included monitoring the treated area for approximately six months. Navistar's evidence (Doc. No. 35) at exhibit C.[5] It is undisputed that just prior to April 18, 1994, Mr. Francendese noted anomalies in the sampling data collected from the chemically treated portion of the site and, thus, directed the TAT contractor to conduct an analysis of the data. The site was re-seeded on September 15, 1994. Monitoring continued, however, during October and November of 1994, as Mr. Francendese had several conversations with the TAT contractor concerning the analysis of the treated area. On November 14, 1994, the TAT contractor collected one soil sample and one concrete sample from the site, and conducted Toxicity Characteristic Leaching Process testing and Multiple Extraction Procedures testing on the samples, as required by the Second Action Memorandum approved by EPA on February 15, 1994. On December

---

[5] Although Navistar's motion is moot, the defendants concurred with Navistar's supporting materials and, thus, did not file their own copies of some documents.

4

7, 1994, the TAT contractor provided Mr. Francendese with satisfactory results from the testing. On February 6, 1995, a draft final OSC report produced by Weston, the TAT contractor, was submitted to EPA.

According to EPA's web page, the date of "actual completion" for the Carlie Lee site removal was September 15, 1994.[6] Mr. Rigger testified in his deposition that the removal action at the site was completed within the 12-month period allowed under the NCP. On July 15, 1997, Mr. Rigger prepared a memorandum to the removal site file, at the request of Annette Hill in the cost recovery section, entitled "Documentation of Completion Date for Carlie Lee Site; Tarrant City, Alabama." Mr. Rigger stated that the replanting of grass on the site "was the final on-site activity and thus 15-SEP-94 is the completion date for this removal action." Navistar's evidence (Doc. No. 35) exhibit D. Mr. Rigger testified that he was establishing a completion date "of all on-site activities that [he] reference[d] in [the] memo." Defendants' motion (Doc. No. 26) exhibit A at 439. He further testified that he understood that EPA was working on a cost recovery case and that "dates are important, because of statute of limitations, and they needed -- they needed some confirmation, and basis, for the date that was in CERCLIS." *Id.* at 440. Mr. Rigger testified again in his deposition that September 15, 1994, was the completion date for the removal action. *Id.* at 306-307, 325.

This action was commenced on October 8, 1998, and it is undisputed that the parties entered into agreements in February and June of 1998, which tolled the running of the

---

[6] Apparently, this website contains a disclaimer which states that the information is not intended to be used in calculating statute of limitations and cannot be relied upon; however, the disclaimer was added to the web page on February 1, 1999, after this action was commenced.

5

statute of limitations on any cause of action that had not expired by January 29, 1998. Accordingly, the agreements provided that the period between January 29, 1998, and October 27, 1998, would not be included in computing the time for the statute of limitations. The defendants argue that the statute of limitations began to run from September 15, 1994, and thus, this action had to be initiated by September 15, 1997. Since it was not, the defendants argue that the tolling agreements are inapplicable since the statute of limitations had already expired on the government's cause of action at the time the agreements were made. The government, on the other hand, argues that the statute of limitations did not begin to run until after the finalization of the OSC report in February of 1995. With the tolling agreements in effect, the government argues that it was well within the 3 year statute of limitations when it filed its action on October 8, 1998.

### III.  Summary Judgment Standard.

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). The movant can meet this burden by presenting evidence showing there is no dispute of

6

material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23. There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." *Id.* at 323.

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). The nonmoving party need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings. *Id.* at 324. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322.

After the plaintiff has properly responded to a proper motion for summary judgment, the court must grant the motion if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to

7

determine whether there is a genuine issue for trial." *Id.* at 249. His guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52; *see also Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 745 n.11(1983) (indicating the standard for summary judgment is "[s]ubstantively . . . very close" to that for motions for directed verdict). However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). If the evidence is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted); *accord Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989).

Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. *Anderson*, 477 U.S. at 254; *Cottle v. Storer Communication, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are functions of the jury, and, therefore, "[t]he evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. The nonmovant need not be given the benefit of every inference but only of every reasonable inference. *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

8

**IV. Discussion.**

The governing period of limitations in this case is set forth in 42 U.S.C. § 9613(g)(2)(A) which provides:

> (2) Actions for recovery of costs
>
> An initial action for recovery of the costs referred to in section 9607 of this title must be commenced–
>
> (A) for a removal action, within 3 years after completion of the removal action . . . .

Although the term "completion" is not defined, the term "removal" is. The statute states:

> (23) The terms "remove" or "removal" means the cleanup or removal of released hazardous substances from the environment, such actions as may be necessary taken in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release. The term includes, in addition, without being limited to, security fencing or other measures to limit access, provision of alternative water supplies, temporary evacuation and housing of threatened individuals not otherwise provided for, action taken under section 9604(b) of this title . . . .

42 U.S.C. § 9601(23).

The Eleventh Circuit has held that "[t]he essential policy underlying CERCLA is to place the ultimate responsibility for cleaning up hazardous waste on 'those responsible for problems caused by the disposal of chemical poison.'" *United States v. Fleet Factors Corp.*, 901 F.2d 1550, 1553 (11th Cir. 1990), *quoting Florida Power & Light Co. v. Allis Chalmers Corp.*, 893 F.2d 1313, 1316 (11th Cir. 1990). Circuit courts have broadly construed the statute of limitations provisions of the law. *See Reardon v. U.S.*, 947 F.2d 1509, 1519 (1st

9

Cir. 1991) ("The running of the statute of limitations is entirely within EPA's control. . . . [T]he government may take its own sweet time before suing, and . . . the removal or remedial action may itself take years to complete . . . ."); *Kelley v. E.I. DuPont de Nemours and Co.*, 17 F.3d 836, 843 (6th Cir. 1994) ("We conclude that Congress intended that the term 'removal action' be given a broad interpretation. First, the statutory definition of 'removal' is broad, and encompasses both physical removal and all RI/FS 'monitor[ing], assess[ing], and evaluat[ing]' activities. . . . Moreover . . . CERCLA has two overriding objectives--cleaning up hazardous waste, and doing so at the expense of those who created it.") (citations omitted).

### A. The EPA memorandum.

The defendants argue that a memorandum entitled "Cost Recovery/Statute of Limitations" (OSWER Directive 9832.9) dated June 12, 1987, that was written by EPA is applicable to this case.[7] The memorandum states in pertinent part that "[a]s a matter of

---

[7] The defendants make a similar argument concerning a statement prepared by OSC Don Rigger, who indicated in a July 15, 1987, one paragraph memorandum to the "Removal Site File" that "15-SEP-94 is the completion date for this removal action." Navistar's evidence (Doc. No. 35) exhibit D. As discussed above with regard to the EPA memorandum, Mr. Rigger's memorandum does not constitute a binding statement on EPA, as it is even more informal than the EPA memorandum. Furthermore, the defendants ignore the fact that Mr. Francendese was the other OSC at the site and was the OSC who noted the anomalies and ordered further testing *after* September 15, 1994. Accordingly, Mr. Rigger's statement and testimony of an earlier completion date for the removal action cannot be and is not conclusive of the issue. The court also notes that Mr. Rigger's statement does not change the fact that the word "completion" remains undefined by EPA. Since different branches, such as the removal branch and the cost recovery branch, appear to have different definitions of the word particular to their functions, Mr. Rigger's statement can in no way constitute the definitive date for statute of limitations purposes. *See* plaintiff's response (Doc. No. 28) at 16-18. Mr. Rigger even testified in his deposition that "there are different ways that different people define completion" and that "the on-scene coordinator and the removal -- the Superfund removal program defines completion as the date of the last physical on-site activity." *Id.*, exhibit 8 at 88. Consequently, the court rejects the defendants' further arguments in their reply brief that in the past, the government, through federal regulations, has provided that OSC reports be filed within varying amounts of time "after completion of removal activities," *see, e.g.,* 40 C.F.R. § 300.165 (1990), and thus, "[t]his provision indicates that an OSC report is not a part of the removal action, but a report prepared by the OSC after the removal action has been completed." Reply (Doc. No. 29) at 4. However, as discussed below, it is clear that the term "removal" is defined as including "to monitor, assess, and evaluate the release . . . of hazardous substances [and] the disposal of removed material," which would arguably include an OSC report. 42 U.S.C. § 9601(23).

policy, the Agency views completion of the removal action as the day the cleanup contractor demobilizes at the site and completes the scope of work identified in the original or modified action memorandum." Navistar's evidence (Doc. No. 35) exhibit A. Thus, the defendants argue that because all of the removal activities identified in the scope of work were finished by September 15, 1994, the date of the last on-site activity, which was the replanting of grass seed, the government did not file its action within the statute of limitations.

The government, on the other hand, asserts that: (1) the memorandum is only a statement of policy and does not bind the agency or constitute an admission; (2) two courts have rejected statute of limitations arguments based on that memorandum; and (3) even if the memorandum is binding, EPA met the guidelines set forth therein. The court agrees. In *Kelley*, the Sixth Circuit held that the memorandum "is not entitled to any particular deference, given its informal nature and its short duration." *Kelley*, 17 F.3d at 842 n.3. The court noted that the memorandum was simply a "policy statement, not a regulation" and had been superseded in 1992 by EPA's proposed Cost Recovery Rule. *Id.* at 842.

Finally, the court notes that the 1987 memorandum specifically states that the scope of work identified in the original and modified action memorandum must be completed as well. The Second Action Memorandum specifically states that "[i]n addition to subjecting the treated waste to the Toxicity Characteristic Leaching Procedure, the treated waste will also undergo Multiple Extraction Procedures that will further guarantee its nonleachability." Defendants' motion (Doc. No. 26) exhibit C. It is undisputed that these tests took place after the TAT contractor went to the site on November 14, 1994, to collect samples for the

11

analyses. Moreover, in the Scope of Work incorporated in the Technical Directive Document (TDD), dated October 15, 1993, EPA directed the TAT contractor to document on-site activities, monitor the performance of the removal, collect and analyze samples, and submit a draft final OSC Report to EPA; the Site Sampling Plan approved by EPA in October of 1993, before the on-site removal action began also required the TAT contractor to prepare a draft final OSC Report. The draft final OSC Report was not submitted until February 6, 1995. Accordingly, the court finds that the 1987 memorandum, even if superseded, does not contravene EPA's denial that the action is time-barred.[8]

### B. National Contingency Plan.

The funding of removal actions is discussed under CERCLA, which specifically states that "obligations from the Fund, other than those authorized by subsection (b) of this section, shall not continue after . . . 12 months has elapsed from the date of initial response to a release or threatened release of hazardous substances." 42 U.S.C. § 9604(c)(1). Furthermore, the regulations state that, unless certain decisions are made by the agency, "CERCLA fund-financed removal actions, other than those authorized under section 104(b) of CERCLA, shall be terminated after $2 million has been obligated for the action or 12 months have elapsed from the date that removal activities begin on-site." 40 C.F.R. § 300.415(b)(5).

---

[8] The defendants point out that EPA confirms "on its web site . . . the completion date as September 15, 1994." Defendants' motion (Doc. No. 26) at 12. The court notes that in *United States v. Johnnie Williams*, No. 98-2704 (W.D. Tenn. Feb. 9, 1999), the defendants asserted that the United States should be estopped from asserting that the limitations period runs from August 21, 1995 because the EPA listed the removal action's completion date as April 4, 1995 on its website." *Id.* at 7. The court found that the defendant had "produced no evidence in support of its motion for summary judgment demonstrating that it relied at any point on the information posted on the EPA's website." *Id.* Likewise, in the instant case, the defendants have not shown any detrimental reliance resulting from the information on the web site.

12

There is no dispute that the on-site removal activities began in November of 1993. Accordingly, the defendants argue that "[a]ny interpretation of the Carlie Lee facts that would extend the removal action past November 1994 would require a finding that EPA not only acted inconsistently with the NCP, but actually violated 42 U.S.C. § 9604(c)(1) and 40 C.F.R. § 300.415(b)(5), the governing statute and regulation." Defendants' motion (Doc. No. 26) at 14. The government, however, asserts that "[t]he additional sampling and analysis at the Carlie Lee Site after September 15, 1994, and the documentation of that data in the final OSC Report unquestionably fall within the scope of Section 104(b)." Plaintiff's motion (Doc. No. 28) at 21. The government goes on to explain that the physical, on-site work for the removal action was conducted under the authority of Section 104(a) and was completed within 12 months of November 1993, while the sampling, lab testing, data analysis, and preparation of the OSC Report which occurred after September 15, 1994, was done pursuant to Section 104(b).

Section 104(b) authorizes the President, acting through EPA, may undertake certain activities deemed necessary to gather information:

> (b) Investigations, monitoring, coordination, etc., by President
>
> > (1) Information; studies and investigations
>
> Whenever the President is authorized to act pursuant to subsection (a) of this section, or whenever the President has reason to believe that a release has occurred or is about to occur, or that illness, disease, or complaints thereof may be attributable to exposure to a hazardous substance, pollutant, or contaminant and that a release may have occurred or be occurring, he may undertake such **investigations, monitoring, surveys, testing, and other information gathering** as he may deem necessary or appropriate to identify the existence and extent of the release or threat thereof, the source and nature of the hazardous substances, pollutants or contaminants involved, and the

13

> extent of danger to the public health or welfare or to the environment. In addition, the President may undertake such planning, legal, fiscal, economic, engineering, architectural, and other studies or investigations as he may deem necessary or appropriate to plan and direct response actions, to recover the costs thereof, and to enforce the provisions of this chapter.

42 U.S.C. 9604(b)(1) (emphasis added). The defendants argue that "none [of these actions] are necessarily part of any removal action at any Superfund site." Defendants' reply (Doc. No. 29) at 4. However, 42 U.S.C. § 9601(23) defines "removal" to include any "action taken under section 9604(b) [104(b)] of this title."[9] Accordingly, although the actions taken under section 9604(b) are considered to be part of the removal action, they are not subject to the 12-month funding limitation imposed by 42 U.S.C. § 9604(c)(1). Consequently, it does not appear that EPA is taking inconsistent positions when it asserts that it has complied with the 12-month funding limitation in Section 9604(c)(1)[10] even though removal activities occurred after November 1994. Therefore, the court denies the defendants' motion for summary judgment on this basis.

### C. Case law.

The defendants argue that *United States v. Ambroid Co., Inc.*, 34 F. Supp. 2d 86 (D. Mass. 1999), was a case decided on similar facts, in which the district court found that the unusual circumstances of the case warranted a finding of separate and distinct removal actions. This court does not find that the facts in the instant case and the facts in *Ambroid* are similar at all. In *Ambroid,* the court addressed the issue of whether "closing out a site"

---

[9] Section 9601(23) also defines "removal" to include "monitor[ing], assess[ing], and evaluat[ing] the release" or disposal of hazardous material.

[10] Mr. Rigger repeatedly stated at his deposition that the removal action was completed within the 12-month limitation imposed by the NCP.

14

is equivalent to "completion of a removal action," and decided that it was. *Ambroid*, 34 F. Supp. 2d at 88. There was no discussion of a final OSC Report being filed in that case. In making its decision, the court noted that the OSC in *Ambroid* had written "case closed" at the bottom of the final POLREP; the EPA had transferred its responsibilities to the state and indicated in its own records that the two removal actions conducted by EPA were separate; and the EPA had failed to comply with the NCP. *Id.* at 87.

In the instant case, the final POLREP indicated that future on-site activities would still take place, including sampling and monitoring of one portion of the site for a period of six months, and there is no issue of multiple removal actions in this case or a transfer of responsibilities to another governmental entity. Finally, as discussed above, the court does not find that EPA failed to comply with the NCP in this case, as the continuing activities were part of the removal action but were not subject to the funding limitation set forth in Section 9604(c)(1). Even if they were, however, the court in *Ambroid* specifically noted that "[t]he EPA may have simply failed to comply with its regulations, which would have no impact on the statute of limitations." *Ambroid*, 34 F. Supp. 2d at 90.

The defendants also cite to the "well-reasoned" and correct opinion in *United States v. Chromatex*, 832 F. Supp. 900 (M.D. Pa. 1993), *aff'd*, 39 F.3d 1171 (3d Cir. 1994), which the defendants state was decided on similar facts. The court agrees. In *Chromatex*, the court found that inspecting water meters at the site, photographing the site, and completing a final pollution report by the TAT were part of the removal action. The defendants in *Chromatex* argued that none of these actions were necessary to the cleanup, but the court held that "[t]he problem with defendants' contention is the liberal interpretation given to the statute

15

of limitations under CERCLA in favor of the government." *Chromatex*, 832 F. Supp. at 902. The court also rejected the defendants' contention that there was no reason for EPA to have waited so long to perform the activities and that the activities were not integral to the removal action but were only done to satisfy EPA's documentation and reporting requirements. The court held that "[n]othing in CERCLA requires that EPA expedite its activities for the benefit of potential defendants in recovery actions," and that the "completion of such requirements is part of the overall 'removal' process. *Id.* Accordingly, the court found that the work was clearly related to the assessment of the work that was previously done on-site." *Id.*[11]

Likewise, in *Williams*, the court actually considered the exact issue of whether a TAT final report[12] was part of the removal action. The court held:

> The TAT final report was part of the process of evaluating the work performed at the W & R Drum site. It provides a clear, concise summary of all the hazards found there and descriptions of the actions taken to remedy them. It is the type of document that would be useful to an agency official evaluating the adequacy of response to a hazard or the need for further follow-up work. Accordingly, the Court holds that the issuance of the TAT's final report was part of the process necessary to "monitor, assess, and evaluate . . . the disposal of removed material," 42 U.S.C. § 9601(23), and was part of the removal action. The action of the United States is therefore timely.

*Williams*, at 4. Furthermore, in *United States v. Aberdeen*, 929 F. Supp. 989 (N.D. Miss. 1996), the defendants argued that a visit to the site to take photographs was unrelated to the

---

[11] The *Chromatex* court also cited to *Reardon v. United States*, 947 F.2d 1509, 1519 (1st Cir. 1991), which held that "'[t]he running of the statute of limitations is entirely within EPA's control.'" *Chromatex*, 832 F. Supp. at 902.

[12] Apparently, this "TAT report" is one and the same as the OSC report which is at issue in the instant case. *See* 40 C.F.R. § 300.165.

removal action and was only done in preparation for litigation. The court rejected the defendant's argument, finding that the visit "was conducted as part of the government's monitoring, assessing and evaluating of the Prairie Metals Site." *Id.* at 992.[13]

The defendants argue, however, that *Chromatex* and *Williams* are not applicable "here because the TAT report for the Carlie Lee Site was not an actual part of the removal action, but merely a bureaucratic exercise," and that it "played no actual role in the monitoring, assessment, or evaluation of the removal action." Defendants' motion (Doc. No. 26) at 14-15. The defendants assert that Mr. Francendese and Mr. Rigger do not recall receiving the report, and that Mr. Rigger admits that the report did not contain any new information and that he did not need it in determining that the removal action was complete. As noted above, the *Chromatex* court rejected a similar argument made by the defendants in that case.

Furthermore, the government has explained that Mr. Francendese, who was one of the OSCs at the site, noticed some irregularities at the site and directed the TAT contractor to run the appropriate tests. Although the site was re-seeded on September 15, 1994, monitoring continued during October and November of 1994, as Mr. Francendese had several conversations with the TAT contractor concerning the analysis of the treated area. On November 14, 1994, the TAT contractor collected one soil sample and one concrete sample from the site, and conducted Toxicity Characteristic Leaching Process testing and

---

[13] The *Aberdeen* court cited to the decision in *United States v. Davis*, 882 F. Supp. 1217, 1226 (D. R.I. 1995), in which the court held that "[c]learly the term removal (as defined by CERCLA), is not limited to on-site activity and includes the time needed to dispose of the removed material as well as the time needed to evaluate the need for further activity." *Aberdeen*, 929 F. Supp. at 992.

Multiple Extraction Procedures testing on the samples, as required by the Second Action Memorandum approved by EPA on February 15, 1994. On December 7, 1994, the TAT contractor provided Mr. Francendese with satisfactory results from the testing, and on February 6, 1995, a draft final OSC report produced by the TAT contractor was submitted to EPA. Shortly thereafter, the OSC report became final and was made a part of the official EPA file. That report contains a detailed summary of the Carlie Lee removal action, including information from the tests performed by the TAT contractor at the behest of Mr. Francendese.

Finally, regardless of whether Mr. Rigger and Mr. Francendese remember getting the report, it is clear that the final report "provides a clear, concise summary of all the hazards found there and descriptions of the actions taken to remedy them. It is the type of document that would be useful to an agency official evaluating the adequacy of response to a hazard or the need for further follow-up work." *Williams*, at 4. The government points out in its brief that:

> Final OSC Reports, prepared pursuant to the NCP, 40 C.F.R. § 300.165, are used by EPA to inform and educate other OSCs about removal technologies and experiences at removal sites. Under the NCP, the National Response Team or Regional Response Team, the groups charged with planning and coordinating CERCLA response actions, at any time after a removal action is completed, may ask for the final OSC Report for that removal. Final OSC Reports may also be requested by Congress and the public for detailed information about a completed removal action.

18

Defendants' response (Doc. No. 28) at 9-10. The defendants do not deny that these final reports may be used in such a manner by EPA and other governmental entities.[14] Accordingly, the court rejects the defendants' argument that the filing of the draft final OSC report should be ignored for statute of limitations purposes and, thus, denies summary judgment based on those grounds.

## V.     Conclusion.

The defendants' motion for summary judgment will be denied, as the court finds that the government's action is not time-barred by the statute of limitations set forth in 42 U.S.C. § 9613(g)(2)(A).

Done, this __14th__ of January, 2000.

EDWIN NELSON
UNITED STATES DISTRICT JUDGE

---

[14] Although 40 C.F.R § 300.165 states that "[p]reparing OSC reports is an additional paperwork burden that is not statutorily mandated," the court finds it irrelevant that the report is not required by statute and that in this case the report may not have been used in the above-described manner thus far.

19